No. 18-15845

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

DEMOCRATIC NATIONAL COMMITTEE, *et al.*,

*Plaintiffs/Appellants*,

v.

KATIE HOBBS, *et al.*,

*Defendants/Appellees*,

and

ARIZONA REPUBLICAN PARTY, *et al.*,

*Intervenors-Defendants/Appellees*.

_____

On Appeal from the United States District Court
for the District of Arizona
No. CV-16-01065-PHX-DLR
Hon. Douglas Rayes

_____

## PLAINTIFFS-APPELLANTS' RESPONSE IN OPPOSITION TO
## DEFENDANTS-APPELLEES' MOTION UNDER CIRCUIT RULE 41 FOR
## STAY OF THE MANDATE

_____

*Attorneys for the Democratic National Committee; DSCC, a/k/a Democratic Senatorial Campaign Committee; and the Arizona Democratic Party:*

Daniel C. Barr
Sarah R. Gonski
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: (602) 351-8000
Facsimile: (602) 648-7000
DBarr@perkinscoie.com
SGonski@perkinscoie.com

Marc E. Elias
Bruce V. Spiva
Elisabeth C. Frost
Amanda R. Callais
Alexander G. Tischenko
PERKINS COIE LLP
700 Thirteenth Street N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
BSpiva@perkinscoie.com
EFrost@perkinscoie.com
ACallais@perkinscoie.com
ATischenko@perkinscoie.com

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................1

II.   LEGAL STANDARD ..................................................................2

III.  ARGUMENT...............................................................................3

    A.    The Attorney General and Intervenors have failed to demonstrate that their petition has a reasonable probability of succeeding on the merits. ....................................................3

    B.    The Attorney General and Intervenors have failed to demonstrate that they will be irreparably harmed if this Court issues the mandate. ..........................................................12

IV.   CONCLUSION...........................................................................16

i

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Martin*,
    375 U.S. 399 (1964)..........................................................................12

*Books v. City of Elkhart*,
    239 F.3d 826 (7th Cir. 2001) ...................................................................2

*California v. Am. Stores Co.*,
    492 U.S. 1301 (1989) (O'Connor, J., in chambers)..............................2

*Chisom v. Roemer*,
    501 U.S. 380 (1991)..............................................................................15

*Crawford v. Marion County Election Board*,
    553 U.S. 181 (2008)................................................................................4

*Dillard v. Baldwin Cty. Bd. of Educ.*,
    686 F. Supp. 1459 (M.D. Ala. 1988) ....................................................6

*Gonzales v. Arizona*,
    677 F.3d 383 (9th Cir. 2012) ..................................................................8

*Gresham v. Windrush Partners, Ltd.*,
    730 F.2d 1417 (11th Cir. 1984) ............................................................12

*Holtzman v. Schlesinger*,
    414 U.S. 1304 (1973) (Marshall, J., in chambers)..............................2

*John Doe I v. Miller*,
    418 F.3d 950 (8th Cir. 2005) ..................................................................2

*Khulumani v. Barclay Nat. Bank Ltd.*,
    509 F.3d 148 (2d Cir. 2007) ...................................................................3

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ................................................................12

*N.C. State Conference of NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) ................................................................12

*Nara v. Frank*,
    494 F.3d 1132 (3d Cir. 2007) ..............................................................11

# TABLE OF AUTHORITIES

## CASES

*Purcell v. Gonzales*,
  549 U.S. 1 (2006) ..........................................................................................11, 15

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ....................................................................................6

*White v. Regester*,
  412 U.S. 755 (1973) ..................................................................................8

## STATUTES

Utah Code Ann. § 17-52a-201(4)(c)(i) ......................................................6

## OTHER AUTHORITIES

Ariz. Const. art. IV, Pt. 2 § 1 .....................................................................6

Fed. R. App. P. 41(d)(1) .............................................................................2

## I.     INTRODUCTION

On November 3, 2020, as a direct result of this Court's ruling in this case, thousands of Arizona voters—a disproportionate number of whom are minority voters—will be able to cast their ballots without the risk of having their eligible votes discarded because they were cast in the wrong precinct. Thousands more will be able to vote a mail-in ballot because they will be able to receive the assistance they need to deliver it to be counted. But this will only happen if this Court issues its mandate, allowing the District Court to enter a final judgment in Plaintiffs' favor. Absent such relief, these voters' rights remain, at best, in limbo or, at worst, wholly denied for yet another election.

This harm is real and irreparable. In contrast, the Attorney General proffers only hypothetical claims of voter fraud—all of which were thoroughly addressed by this Court in its opinion—and contrived claims of voter confusion in support of his request for a stay. Moreover, neither the Attorney General nor the Intervenors-Defendants-Appellees ("Intervenors") present any argument demonstrating that the issues in this case warrant review by the United States Supreme Court or, more importantly, have a reasonable probability of being accepted for review and subsequently overturned by the Court. Indeed, this is unsurprising given that the arguments raised by both parties are based on a misreading of this Court's opinion or misunderstandings of the governing caselaw on Section 2 of the Voting Rights

1

Act ("VRA"). Accordingly, this Court should ensure that thousands of Arizona voters are able to fully exercise their right to vote as soon as possible by denying the motion to stay the mandate and issuing its mandate forthwith.

## II.   LEGAL STANDARD

A motion to stay the mandate pending a petition for certiorari must show that "the petition would present a substantial question and that there is good cause for a stay." Fed. R. App. P. 41(d)(1). The grant of such a motion "is far from a foregone conclusion." *Books v. City of Elkhart*, 239 F.3d 826, 827–28 (7th Cir. 2001) (quotation marks and citations omitted). Rather, the Court's inquiry must determine whether the movant has a reasonable probability of succeeding on the merits and whether the movant will suffer irreparable injury. *Id.*; *see also, e.g.*, *John Doe I v. Miller*, 418 F.3d 950, 951 (8th Cir. 2005).

In general, to demonstrate a reasonable probability of succeeding on the merits of the proposed certiorari petition, a movant must show a reasonable probability that four Justices will vote to grant certiorari and a "fair prospect" that five Justices will vote to reverse the judgment of this Court. *See California v. Am. Stores Co.,* 492 U.S. 1301, 1307 (1989) (O'Connor, J., in chambers). Similarly, where necessary, the Court should "balance the equities when ruling on stay applications and determine on which side the risk of irreparable injury weighs most heavily." *Holtzman v. Schlesinger*, 414 U.S. 1304, 1308–09 (1973) (Marshall, J., in chambers). The

2

decision whether to stay lies in the Court's discretion. *See Khulumani v. Barclay Nat. Bank Ltd.*, 509 F.3d 148, 152 (2d Cir. 2007) (citations omitted).

## III.   ARGUMENT

### A.   The Attorney General and Intervenors have failed to demonstrate that their petition has a reasonable probability of succeeding on the merits.

The Attorney General's and Intervenors' arguments in support of Supreme Court review and a stay of this Court's mandate rely on misunderstandings of Section 2 precedent, are based on misreadings of this Court's opinion, or are wholly unsupported, failing to demonstrate that their petition is reasonably likely to succeed on the merits and that a stay of this Court's mandate is appropriate.

The Attorney General's request for a stay is premised, almost entirely, on the fact that in 2018—three years after H.B. 2023's enactment in Arizona—fraud occurred in North Carolina's Ninth Congressional District election. AG Mot. at 1, 4-6 (Dkt. 124). Specifically, the Attorney General asserts that a stay is warranted because the Supreme Court "could easily disagree" with the Court's treatment of that "evidence" in its opinion.[1] *Id.* at 5-6. This argument is unavailing for several reasons. *First*, the only basis that the Attorney General provides for a purported disagreement is the Supreme Court's finding in *Crawford v. Marion County Election*

---

[1] Because the incident in North Carolina occurred after H.B. 2023 was passed and after the trial in this matter, it was not evidence in the underlying case, though it was thoroughly considered by this Court in its opinion.

*Board*, 553 U.S. 181 (2008), that examples of fraud in other states provided a justification for the law challenged in that suit. *Id.* at 195. But *Crawford* was not a VRA case, nor did it evaluate the justification of voter fraud in the context of a Section 2 results or intent test. Thus, it is simply inapplicable here and cannot support a petition for certiorari. Moreover, even if it did apply (which it does not), the controlling opinion in *Crawford* made clear that, courts must not "apply[] any 'litmus test' that would neatly separate valid from invalid restrictions" and must "make the 'hard judgment' that our adversary system demands" in each case. *Id.* at 190. In other words, *Crawford* finds that each case, including this one, requires a careful examination of the evidence before the court. That is precisely what occurred here and, as such, neither *Crawford* nor the North Carolina fraud cited by the Attorney General indicate that there is a reasonable probability that a petition for certiorari will be successful.

*Second*, and more importantly, this Court's analysis of the North Carolina fraud "evidence" is consistent with long-standing Supreme Court precedent, which requires the court "to make an 'intensely local appraisal,'" of the challenged law and its impact. Slip op. at 91 (Dkt. 123) (en banc) (citing *Thornburg v. Gingles*, 478 U.S. 30, 78 (1986)). A case involving election fraud that occurred in another state, after H.B. 2023 was passed, after the trial on H.B. 2023 occurred, and which fails to comport with Arizona's long history of fraud-free ballot collection—a practice that

4

was and is necessitated by Arizona's history of discrimination and the on-going effects thereof—has no place in a Section 2 analysis and does not support a petition for Supreme Court review. *See id.* Indeed, for this same reason, the Attorney General's arguments that a stay is also warranted because the Court failed to give weight to the Carter-Baker Report and because ballot collection bans exist in other states are also unavailing. AG Mot. at 6-7. Neither of these arguments, both of which were considered by this Court, *see* slip op. at 91, speak to the impact of or justifications for H.B. 2023 in Arizona, as such, they do not fall within the intensely local analysis that the Supreme Court requires for Section 2, and are unlikely to warrant Supreme Court review.

Finally, as explained by this Court, even if the 2018 North Carolina fraud was somehow relevant to the Court's Section 2 analysis in Arizona, H.B. 2023 simply does not address it. Slip Op. 92. Indeed, the specific fraud perpetrated in North Carolina is not prevented by H.B. 2023 and, in fact, was illegal in Arizona long before H.B. 2023's passage.[2] *Id.* And that type of fraud would still be illegal if H.B. 2023 were enjoined. *Id.* Thus, the North Carolina evidence simply has no legal or factual bearing on this case and, consequently, the Attorney General has failed to

---

[2] In particular, while the Attorney General frames the fraud in North Carolina simply as ballot collection fraud, much of the North Carolina fraud was not premised on the collection of absentee ballots. Rather, it involved alterations on absentee ballot applications, which would not be prevented by, nor is it related to, H.B. 2023.

demonstrate that it is reasonably likely to result in Supreme Court review or, consequently, to favor a stay.

While the bulk of the Attorney General's request for a stay centers on review of this Court's H.B. 2023 determination, he also provides one single paragraph of argument on Arizona's policy of discarding out-of-precinct ballots ("OOP policy"), noting only that the Court's OOP policy presents "important" issues because other states have similar laws. AG Mot. at 7. This is plainly insufficient. As discussed, the existence of OOP regimes in other states is irrelevant to the intensely localized analysis that Section 2 requires. *See* slip op 91. In fact, it is utterly unsurprising and commonplace that a practice implemented without issue in one jurisdiction may violate the VRA in another jurisdiction. For example, the practice of at-large and multi-member districting remains a common and legal feature of the electoral structure of some states, *see, e.g.*, Ariz. Const. art. IV, Pt. 2 § 1 (multi-member legislative districts); Utah Code Ann. § 17-52a-201(4)(c)(i) (at-large county commission districts), while such practices have long been invalidated in others under the VRA, *see Gingles*, 478 U.S. at 47 (affirming order invalidating multi-member legislative districts under Section 2); *Dillard v. Baldwin Cty. Bd. of Educ.*, 686 F. Supp. 1459, 1464 (M.D. Ala. 1988) (invalidating at-large school board districts under Section 2). This is a necessary feature of the VRA's intensely local appraisal. And this is particularly true here, where it is undisputed that Arizona is a

complete outlier with respect to its disenfranchisement of voters who cast OOP ballots, demonstrating that not just legally, but factually this Court was sound in its analysis of this issue. Slip op. 12-13.

Perhaps precisely because the Attorney General failed to advance any persuasive arguments on Arizona's OOP policy, Intervenors purport to identify several grounds for which this Court's evaluation of the OOP policy under Section 2 is likely to be reviewed by the Supreme Court. But these arguments, most of which are based on a misreading of this Court's opinion, also fail to support a stay. Specifically, Intervenors argue that this Court's analysis of prong one of the Section 2 results test is flawed because it is premised on the finding that Section 2 can be violated when "any" voter is denied an equal opportunity to participate in elections. Intervenor Mot. at 5-6 (Dkt. 125). In fact, the Court expressly recognized that "while there may be a de minimis number in vote denial cases challenging facially neutral policies or laws, [] the 3,709 OOP ballots in our case is above any such de minimis number." Slip Op. 107; *see also id.* at 44 ("We are willing to assume in such a case that more than a de minimis number of minority voters must be burdened before a Section 2 violation based on the results test can be found. . . . 3,709 ballots—is hardly de minimis."). Thus, this Court did not even reach the premise that Intervenors cite as warranting review. As a result, Intervenors' arguments that the Court's "premise"

also conflicts with Fourth, Sixth, and Seventh Circuit decisions as well as its own decision in *Gonzales v. Arizona*, 677 F.3d 383 (9th Cir. 2012) similarly fail.[3]

Moreover, even if the Court had found that there was no de minimis number in Section 2 cases, which it did not, there is no indication that this finding would warrant a grant of certiorari. As explained in the Court's opinion, this interpretation of Section 2 comports with the VRA's statutory language, is consistent with the Fourth Circuit's interpretation of Section 2 and its application to an OOP law in another state, and tracks the interpretation of Section 2 that the Department of Justice set forth in its amicus brief *in support of the Attorney General's and Intervenors' positions* in this case. Slip op. 43-47, 107. Given this consensus, there is little reason to believe that the Supreme Court would grant certiorari on these grounds. This is particularly true here, where this case simply does not involve a de minimis number of voters, meaning that this purported basis for disagreement is not even presented by this case.[4]

---

[3] The majority explained at length that its decision was in line with *Gonzales* and made clear that no in circuit conflict exists. Slip Op. 107-08.

[4] Intervenors also cite *White v. Regester*, 412 U.S. 755 (1973), for the proposition that the judiciary tolerates "different results" from election laws where the results are "justif[ied] 'based on legitimate considerations incident to the effectuation of a rational state policy." Intervenor Mot. at 8 (citing *White*, 412 U.S. at 764). But *White* has no application here as it did not involve a Section 2 analysis. Rather, it discussed the proper standard for an Equal Protection analysis when evaluating a reapportionment map.

Intervenors' arguments with respect to prong 2 of the Section 2 results test are similarly flawed. Contrary to Intervenors' arguments, the Court did not merely determine "that some combination of the Senate Factors [was] present" in Arizona and find a violation of Section 2. Intervenor Mot. at 9. Rather, as explained at length in the opinion, the Court evaluated whether "there is a relationship between the challenged standard, practice, or procedure, on the one hand, and social and historical conditions on the other." Slip op. at 37-38. This application of prong 2, which "evaluate[s] a disparate burden in its real-world context rather than in the abstract," slip op. at 38, is precisely in line with the Sixth Circuit text that the Intervenors cite as conflicting, which analyzes the interaction of the relevant social and historical conditions and the challenged election practice. Intervenor Mot. at 9. Thus, there is no conflict of law on this point, and it is unlikely to lead to Supreme Court review.

Intervenors' argument that the Court erred in its review of Senate Factor 9, the "tenuousness" of the justification for the OOP policy, Intervenor's Mot. at 9-10, also fails. In particular, Intervenors state that the Court failed to consider the district court's finding that the OOP enforcement mechanism, i.e., disenfranchisement, "allows Arizona to realize the 'the [sic] full range of benefits that correspond with the precinct-based system." *Id.* at 10 (quoting ER49). But this Court did not fail to consider that proposition and, in fact, cited a similar statement from the district court

in its opinion, which noted just that. *See* slip op. at 78 ("Arizona's policy to not count OOP ballots is one mechanism by which it strictly enforces this system to ensure that precinct-based counties maximize the system's benefits."). Rather, as the Court explained, this finding reflects the district court's misunderstanding of the question before it with respect to the OOP policy, which was not the justification for the precinct-based voting system but, instead, the justification for "Arizona's policy of entirely discarding OOP ballots." *Id.* Thus, the Court properly considered all of the district court's findings and was sound in determining that the district court erred. Moreover, even if Intervenors' argument were correct (which it is not), tenuousness is only one of many Senate Factors and the majority of the Senate Factors would still weigh in Plaintiffs' favor, supporting the Court's ultimate finding that Arizona's OOP policy violates Section 2 and counseling against granting certiorari.

In a final effort to support his Motion, the Attorney General provides a laundry list of reasons—almost all of which are wholly unsupported—that might cause the Supreme Court to review this case: (1) the Supreme Court's stay three days before the election of this Court's earlier injunction of H.B. 2023, (2) disagreement between this Court, the panel, and the district court on the outcome, (3) the fact that this is a presidential election year, (4) that Section 2 vote denial claims are a "growing part of the election litigation landscape," and (5) that the Supreme Court has not yet considered a Section 2 vote denial case. AG Mot. at 7-8. But this laundry list is

10

similarly unpersuasive. As an initial matter, as the Attorney General recognizes in his Motion, the Supreme Court's previous involvement in this case was not on the merits. AG Mot. at 10. Rather, the Court issued a *Purcell v. Gonzales*, 549 U.S. 1 (2006)-based ruling just three days before the 2016 General Election. Indeed, if anything can be divined from the Supreme Court's previous action it is not that the Court will weigh in here, but instead that this Court and the district court must issue their mandate and final judgment now, when the general election is still over nine months away and the presidential primary election is over a month way, to avoid making changes to the law just days before the election. *See* discussion *infra*.

Moreover, that there were contrary opinions issued by the district court and original panel is also unpersuasive, as disagreements of that nature are true of virtually any case that is heard before an en banc court (and, indeed, is often precisely why the en banc court takes cases). The en banc nature of this opinion and, in particular, the fact that six judges of this en banc court agree on the legal analysis set forth therein (and that seven judges agree as to the analysis of the Section 2 results test), is all the more reason to assume, not that the Court's ruling is flawed, but that it is legally sound and less likely to be reviewed. Finally, the latter three reasons proffered are provided without explanation or support, making them wholly insufficient to support an application for a stay. *See, e.g.*, *Nara v. Frank*, 494 F.3d 1132, 1133 (3d Cir. 2007) (noting that a stay of the mandate is "exceptional" and

11

finding that a request for a stay was insufficient where the movant failed to cite support indicating that the Supreme Court would disagree with analysis in question). And, as the discussion above indicates, this Court's Section 2 analysis is in line with Supreme Court precedent making this case no more likely than any other case to be selected for Supreme Court review.

**B.      The Attorney General and Intervenors have failed to demonstrate that they will be irreparably harmed if this Court issues the mandate.**

Absent the issuance of the mandate, thousands of Arizona voters will continue to have their right to vote burdened, abridged, and in some cases wholly denied. There is no question that this harm is irreparable. *See, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury.") (citations omitted). Likewise, because Arizona acted with discriminatory intent in passing H.B. 2023, irreparable harm is presumptively established. *See Anderson v. Martin*, 375 U.S. 399, 400-04 (1964); *see also N.C. State Conference of NAACP v. McCrory,* 831 F.3d 204, 238 (4th Cir. 2016) ("When discriminatory intent impermissibly motivates the passage of a law, a court may remedy the injury—the impact of the legislation—by invalidating the law."); *cf. Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984) (holding "because of the subtle, pervasive, and essentially irremediable nature of racial discrimination, proof of the existence of discriminatory

12

housing practices is sufficient to permit a court to presume irreparable injury"). No grounds for irreparable harm presented by the Attorney General or Intervenors outweigh this.

For example, Intervenors assert that local candidates will be harmed because they will have to expend more resources to ensure that voters vote in the correct precinct now that voters no longer face the consequence of having their ballot discarded for voting OOP. Intervenor Mot. at 10. But that is not true. Local candidates are in the same position once the mandate issues as they are now. Under both regimes they must expend resources to ensure that the voters who are eligible to vote for them arrive at the correct location. Moreover, even if they would have to expend more resources (which they will not), this type of harm is no different than the diversion of resources harm that Plaintiffs currently suffer at a far greater rate as a result of Arizona's OOP policy. Plaintiffs must expend significant resources to ensure that their voters—who are disparately disenfranchised due to the OOP policy—are able to vote. And the harm asserted by Intervenors certainly does not outweigh the disenfranchisement suffered by Plaintiffs' constituencies and Arizona voters more broadly, meaning that the equities would not balance in Intervenors' favor or in support of a stay.

The primary ground advanced by the Attorney General is that there is a risk of voter fraud if the mandate issues. As this Court and even the district court found,

however, that is not true. Slip Op. at 24-33. There is no evidence of ballot collection related voter fraud in Arizona. *Id.* And, even if there were, H.B. 2023 does not address that fraud. *Id.* at 24-25. Rather, the laws addressing that fraud are in place and have been in place for years. *Id.* Indeed, the ability of those laws to protect against fraud—and, consequently, the tenuousness of H.B. 2023—is demonstrated by that fact that H.B. 2023 is not actually being enforced. ER 0036-37 (Dkt. 27-1). Thus, there is also no credible argument that enforcement activity related to voter fraud will change if the mandate issues. Accordingly, issuing the mandate and enjoining H.B. 2023 will not change the status quo as the risk of ballot collection related voter fraud in Arizona remains the same: virtually nonexistent and adequately protected against. What issuing the mandate will do, however, is free up responsible, organized, and law-abiding organizations like Plaintiffs (who are currently abiding by H.B. 2023 despite its nonenforcement) to provide much needed ballot collection assistance to voters.

The Attorney General's claims of voter confusion are similarly untenable. As discussed, the 2020 elections are all sufficiently far away to explain any necessary changes to the laws to voters. *See* discussion *supra*. Indeed, if the Attorney General's voter confusion argument were to carry the day, then it would mean that no election law could be overturned during an election year, insulating those laws from review at precisely the time when it is most critical that voters' rights be protected and

providing incentive to state legislatures to pass discriminatory and unconstitutional laws anytime there is an election pending. This is plainly not what the VRA, which was designed to "rid[] the country of racial discrimination in voting," *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966)), the U.S. Constitution, or *Purcell v. Gonzales* contemplate.[5]

Most tellingly, however, is that it is the Attorney General—who has no oversight over election administration or voter education—and not the Secretary of State who makes this argument. Indeed, the Secretary of State, who is in the best position to assess voter confusion and to gauge whether her office and the counties can educate voters in advance of the pending elections, has not sought a stay and has publicly stated that she will not pursue an appeal of any of this Court's rulings. *Hobbs opposes AG's appeal of DNC v. Hobbs*, Az.gov (Jan. 29, 2020), https://azsos.gov/about-office/media-center/press-releases/1094. In fact, with respect to the OOP policy, she has stated that she is "confident in their ability to address the issues associated with [OOP] voting." *Id.* Thus, there is simply no support either legally or factually for the Attorney General's voter confusion

---

[5] The Attorney General's argument is also particularly nonsensical in this context, given that H.B. 2023 was passed on March 24, 2016, less than nine months before the general election and in close proximity to all of the elections the Attorney General cites as problematic here.

assertion which appears to be as ginned up as the voter fraud rationales underlying H.B. 2023. Accordingly, it does not provide support for a stay of the mandate.

## IV.   CONCLUSION

For these reasons, the Court should deny the Attorney General and Intervenors' motion to stay the mandate and issue its mandate forthwith.

RESPECTFULLY SUBMITTED this 10th day of February, 2020.

  s/ *Bruce V. Spiva*
_____

Daniel C. Barr (AZ# 010149)
Sarah R. Gonski (AZ# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788

Marc E. Elias (WDC# 442007)
Bruce V. Spiva (WDC# 443754)
Elisabeth C. Frost (WDC# 1007632)
Amanda R. Callais (WDC# 1021944)
Alexander G. Tischenko (WDC# 263229)
PERKINS COIE LLP
700 Thirteenth Street N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
BSpiva@perkinscoie.com
EFrost@perkinscoie.com
ACallais@perkinscoie.com
ATischenko@perkinscoie.com

*Attorneys for Plaintiffs the Democratic
National Committee; DSCC, aka
Democratic Senatorial Campaign
Committee; and the Arizona Democratic
Party*

17

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel for Appellants, certifies that this motion response complies with the length limits permitted by Fed. R. App. P. 27(d)(2)(A). The motion response contains 3,950 words, excluding the portions exempted by Fed. R. App. P. 27(a)(2)(B). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

_s/ Bruce V. Spiva_

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the attached document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 10, 2020. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system

*s/ Michelle DePass*